Fremont-Smith, Thayer, J.
This case was tried juiy-waived in April 2007. It is not disputed that following a motor vehicle accident in Florida in 1998 in which plaintiff was seriously injured, plaintiff demanded that the other operator (Anthony Caban’s) insurer, Arbella, pay her the per person policy limits of $20,000. When such offer was not promptly forthcoming from Arbella, plaintiff sued Caban in Florida. After settlement negotiations between plaintiffs counsel and Arbella-ap-pointed counsel for Caban, a settlement was reached whereby plaintiff obtained a stipulated judgment *448 against Caban for $450,000 and an assignment of Caban’s rights against Arbella in return for her provision of a hold harmless agreement in favor of Caban.
Plaintiff then brought this suit against Arbella in 2002, seeking compensatory and punitive damages under G.L.c. 93A and G.L.c. 176D arising out of Arbella’s allegedly unreasonable failure to settle and its related activities.
The Court finds, based upon all the credible evidence, that following the August 1998 accident, plaintiff retained counsel in Massachusetts (Anthony Christian) who, on September 14, 1998, wrote Arbella, informing it that he represented the plaintiff and requesting coverage information. On September 21, 1998, Arbella’s claims representative, Giacopello, responded by requesting a medical records authorization.[1] On September 28, 1998 Christian sent a letter to Arbella which detailed Caban’s liability for the accident and plaintiffs injuries, enclosed selected medical records, and demanded that Arbella tender the $20,000 policy limits within thirty days, i.e., on or before October 29. The letter provided that, upon tender of the proceeds, plaintiff would release Caban from all liability and would agree to indemnify Arbella for any outstanding medicare or other liens on the proceeds.
During this 30-day period, Arbella made no written response. Although each side intermittently attempted unsuccessfully to reach the other by telephone during the 30-day demand period, neither Christian nor Arbella’s adjuster persisted so as to engage in an actual conversation. On the final day of the 30-day period, Arbella’s adjuster left a call-back voice mail on Christian’s phone, and he attempted twice on that day to return the call but only reached her voice mail.
Immediately upon expiration of the 30-day period, viewing Arbella’s lack of response to the demand as a rejection of his offer, Christian filed a lawsuit against Caban in Florida on November 2, 1998.
Not until February 22, 1999, five months after the demand, did a different Arbella adjuster finally respond in writing to the demand letter, advising Christian that Arbella was then attempting to determine what claims the other injured persons (passengers in Caban’s car) might have, in order to attempt to structure a global settlement. Finally, on April 25, 1999, seven months after the demand letter, Arbella offered the $20,000 policy limits to Dattilo without any conditions other than provision of a release. The plaintiff rejected this offer.
On November 6, 2000, a settlement understanding was reached between Christian and Caban’s Arbella-appointed Florida counsel whereby a stipulated judgment was to be entered against Caban for $450,000, an assignment was to be made to plaintiff of Caban’s rights against Arbella for unfair settlement practices, and a hold harmless agreement was to be provided to Caban by plaintiff. Arbella was kept apprised of the Florida settlement negotiations and of the above settlement terms; and waived in writing any claim for non-cooperation under the policy against Caban in regard thereto.
Although the accident occurred in Florida, the parties agreed at trial that the relevant law of Massachusetts and Florida is similar, so that the Court should consider G.L.c. 93A and G.L.c. 176D to be controlling.
The following “unfair claim settlement practices,” defined in G.L.c. 176D, §3, are applicable:
(a) misrepresenting pertinent facts — relating to coverages at issue;
(b) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
(e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(f) failing to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear; and
(n) failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.
Defendant’s witnesses at the trial did not dispute that, by October 1998. when the demand letter was sent, liability and damages were reasonably clear. Caban had admitted he was at fault and had pleaded guilty to driving under the influence which, under Florida law, exposed him to punitive damages. Arbella’s own investigator had ruled out any contributory negligence on the part of Dattilo. With respect to exposure for damages in excess of the $20,000 per person policy limits, although Christian had not responded to Arbella’s request for execution of a medical authorization form, Arbella had been provided with detailed medical bills and a doctor’s operative report regarding the surgery which Dattilo had undergone for fractured bones as a result of the accident. At trial, plaintiffs failure to provide a medical authorization form was not alleged to have justified Arbella’s failure to have attempted to effectuate a prompt settlement within the policy limits, and the Court finds that it was not a justification.
The letter demanded tender of the $20,000 insurance per-person policy limits prior to delivery of a release. While the proposed procedure was not customary (a release is usually provided before tender of payment) defendant’s witnesses admitted they made no objection to the demand in that respect or made any attempt to negotiate a different procedure for exchange of the release and payment, as is the accepted industry practice. Indeed, under Thaler v. American Ins. Co., 34 Mass.App.Ct. 636 (1993), which at the time was the controlling case, Arbella had no *449 legal right to insist on any release as a prerequisite for a settlement. The Court finds that the proposed procedure was not a justification for failing to make a prompt and equitable offer of settlement.
The evidence was in dispute as to whether Arbella had a legitimate concern about any medicare lien on the proceeds. Christian’s letter indicated that upon tender of payment, Dattilo would agree to hold Arbella harmless for any medical or other liens, whereas Axbella’s practice was to require release of such liens before tender of payment. But no such concern was communicated to Christian, and defendant’s witnesses admitted that the mechanics of getting such a release from lien-holders is customarily worked out between the parties. In any event, when the policy limits were ultimately offered, it was without any requirement as to a previous discharge of medicare liens. I find that any concern Arbella may have had about a possible medicare lien was not a justification for Arbella’s failure to make a prompt and equitable offer of settlement.
At trial, defendant’s witnesses asserted that a “global settlement” was a prerequisite to any tender of payment, as there were other claimants who had serious injuries and whose claims could exceed the $20,000 per person and $40,000 per accident limit.[2]
It is true that, so long as an insurer does not violate the strictures of G.L.c. 176D, §3, it has discretion as to how it divides up the policy limits among multiple claimants, and is not obligated to settle with the first claimant, to the exclusion of later claimants. It is also true that, in such a situation, an insurer’s obligation is to attempt to protect the insured from claims in excess of the policy limits by attempting a global settlement within the policy limits as to which all claimants, if possible, accede and provide releases for the insured. This necessarily entails evaluating each such claim and contacting all potential claimants to seek their concurrence.
However, Arbella’s obligation to attempt a global settlement was never expressed to Christian as a concern until, July 22, 1999, seven months after the demand letter and five months after the Florida suit had been filed, when he was first notified (in writing by a different Arbella employee) that Arbella was then in the process of contacting the other claimants in an effort to “fairly evaluate the claims.” This purported justification for not promptly acceding to plaintiffs demand when liability and damages were reasonably clear, even if it had been a legitimate concern in October 1998, was not made known to plaintiff “within a reasonable time” as required by G.L.c. 176D, §3(e) or communicated “promptly,” as required by G.L.c. 176D, §3(m) and (n). See Hartford Casualty Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 120-21 (1997).
Additionally, Arbella failed to notify Caban of the settlement offer, and Arbella’s letter, when it belatedly did notify Caban on April 29, 1999, that he was exposed to excess of policy liability, misinformed him, in violation of G.L.c. 176D, §3(a), that “a formal demand has not been received.”[3] See Peckham v. Casualty Ins. Co., 895F 2nd 830, 835 (1st Cir. 1990) at 840.
Accordingly, the Court finds for the plaintiff on all counts of the complaint and the question is presented what amount of damages, in addition to $20,000 on the breach of contract counts, should be awarded under G.L.c. 93A as a result of Arbella’s G.L.c. 176D violations for Datillo’s injuries suffered either as an assignee of Caban’s rights against Arbella, or directly as a third-party beneficiary of the insurance contract.
Plaintiff contends that the Court should award to Dattilo in her capacity as assignee of Caban’s rights, the Florida judgment ($450,000) to the extent it exceeded the $20,000 per person policy limits, citing DiMarzo v. American Mutual Ins. Co., 389 Mass. 85 (1983). In that case, the insurer unfairly refused to settle within the policy limits ($20,000) and a jury verdict resulted in a judgment and execution for $104,000 against the insured. Months later, plaintiff negotiated with the insured an assignment of the insured’s rights against American Mutual in return for his provision of a covenant not to execute the judgment against the insured. The Court held that the judgment in the tort case constituted a cognizable injury to the insured which was a foreseeable consequence of American Mutual’s unfair insurance practices, as to which multiple damages could be awarded.
The situation here, however, is significantly different. Here, the Court finds that there was no litigated judgment which placed Caban in jeopardy in any way. On the contrary, in return for his agreement for a consent judgment to be entered against him and for his assignment to the plaintiff of his rights against Arbella, Caban was held harmless from the judgment against him, which, it was understood from the beginning, would be enforced only against Arbella.
The settlement papers were, perhaps intentionally, ambiguous. Although the agreed to “final judgment” is dated November 6, 2000, it was only agreed-to by Caban in the “settlement agreement” dated May 16, 2001, wherein he also agreed to assign all of his rights against Arbella for unfair insurance practices, to Dattilo. A separate “assignment of all claims” is dated February 1, 2001. The settlement agreement signed by Caban on May 16, 2001 provides not only that he agrees to entry of the final judgment for $450,000, and that he has assigned his claims, but that Dattilo “agrees to postpone execution of the Final Judgment against Caban pending resolution of the action against Arbella.” The next clause of the agreement had provided that “this agreement is not intended to release Caban of liability for the Final Judgment if the action against Arbella is unsuccessful,” but this clause was stricken by being interlined, which interlineage was initialed by the parties.
*450 Although the intention of the parties to be gleaned from these papers might be viewed as ambiguous, Caban testified at trial, without challenge, that he was assured and understood from the beginning of the settlement negotiations that the parties intended that he would be subjected to no personal liability for the $450,000 judgment. I find that this was at all times the intention of the parties to the settlement documents.
Nevertheless, the Supreme Judicial Court has held that, in these circumstances, so long as there was no collusion (and I find there was none) and the amount of the settlement agreement was reasonable (and I find that it was), the insurer is to be held liable for the excess judgment, in this case $430,000, Compione v. Wilson, 422 Mass. 185, 192-93 (1996). This amount is therefore to be awarded to the plaintiff.
It is not, however, an amount which is to be multiplied by a court for punitive damages under C. 93A §9(3).[4] In Clegg v. Butler, 424 Mass. 413, 424 (1997), the Court said, “when a case has been settled outside the courtroom, there is no judgment on which to base the multiple damage calculus . . . the term judgment is founded on a decision by the court, not an award of an arbitrator.” Here, there was no trial and no “decision by a court,” but only a stipulated judgment entered by the court pursuant to a settlement.[5]
Indeed, The Massachusetts Appeals Court has recently questioned whether even a litigated judgment remains a basis for multiple damages under C. 93A, §9(3) where a hold harmless agreement was provided to be insured independently at a later time pursuant to a later, independent settlement, Bolden v. O’Connor Cafe of Worcester, Inc., 50 Mass.App.Ct. (2000) at 68-69. The Court thus questioned whether even an underlying litigated judgment remains a basis for multiple damages under G.L.c. 93A, §9(3) where a later settlement which was independent of the judgment insulated the insured from punitive liability for the excess judgment.[6]
In addition to the excess judgment ($430,000) Dattilo was injured in the sum of $20,000 by Arbella’s wrongful refusal to promptly accept the settlement demand, by the loss interest on that amount and by the amount of Dattilo’s reasonable attorney fees and costs incurred since November 1989. See Columbia Chiropractic Group, Inc., v. Trust Ins. Co. 430 Mass. 60, 63 (1999) (attorneys fees incurred as a result of an insurer’s wrongful failure to settle may be awarded as c. 93A damages and such amount may be subject to punitive damages.
Were Arbella’s unfair insurance practices intentional or wilful? I find that, while probably not malicious, Arbella’s failure to settle when liability and damages were reasonably clear and failure to even make any response to Christian’s demand for a number of months, constituted more than mere negligence, but were wilfully reckless, and, in that sense, intentional. See: Katter v. Demoulas, 433 Mass. 1 (2000), at 15-16. Accordingly, the Court will double these latter amounts uporr determination of plaintiffs reasonable legal fees and expenses from and after November 1, 1989. See: Cohen v. Liberty Mutual Ins. Co. ,41 Mass.App.Ct., 748, 756 (1996) (trial court properly doubled amount of unpaid insurance proceeds and the lost interest on the proceeds).

ORDER

Accordingly, it is ORDERED that plaintiff shall file, within thirty (30) days, counsel’s affidavit and supporting documentation in regard to plaintiffs reasonable attorneys fees and costs incurred by plaintiff since November 1, 1989 together with plaintiffs computation of the $20,000 amount of interest which has accrued since that time as a result of defendant’s withholding of the insurance proceeds. Within ten (10) days thereafter, defendant may file its opposition papers and its computation of interest (if it differs from plaintiffs), following which a hearing will be scheduled.
A final judgment will then be entered for the excess judgment ($430,000), for double the amount of the withheld policy limits ($40,000), for double the amount of interest on that $20,000 which has accrued between November 1, 1989 and the entry of judgment, and for double the amount of plaintiffs reasonable attorney fees and costs incurred since November 1, 1989 in connection with this lawsuit and the Florida lawsuit.[7]

The medical authorization form was never provided by Christian.

Two of Caban’s passengers had been transported by medical helicopter from the accident scene to a hospital.

Although some of Arbella witnesses opined that Christian’s demand letter was not a “formal demand,” others conceded that it was, and conceded that Caban had been misinformed. The Court finds that letter plainly was a “formal demand.” As noted above, by way of the assignment, plaintiff stands in the shoes of Caban for assertion of unfair insurance practices against Arbella.

The 1989 amendment to G.L.c. 93A, §9(3) provides that “the amount of actual damages to be multiplied by the court shall be the amount of judgment on all claims,” rather than just the amount of lost interest on the wrongfully withheld insurance proceeds.

Indeed, the “judgment” entered by the Florida Court was not even signed by a judge, but was, literally, rubber-stamped.

The Appeals Court seems to have been reluctant to use the excess judgment in that case as a basis for multiple damages, recognizing that this could result in punitive damages out of all proportion to the compensatory damages. In this case, were the excess judgment ($430,000) to be doubled to $860,000 this would result in a punitive award 43 times the amount of the withheld policy limits ($20,000). Such a grossly excessive punishment could well run afoul of the Due Process clause of the Fourteenth Amendment. State Farm Mut. Auto Ins. Co. v. Campbell 538 US. 408 (2003).

The court will not award separate attorneys fees incurred with respect to the c. 93A-176D counts of the complaint, as in the circumstance, this would be duplicative of the attorney fees to be awarded as damages.